IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

DONAVOUS DRENNON,

    Petitioner

v.

CHRISTOPHER BRUN, as Warden
    of the Turney Center Industrial Complex

    Respondent

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

The Petitioner, Donavous Drennon, unjustly imprisoned by the State of Tennessee and its Board of Parole, prays for the writ of habeas corpus as follows:

## INTRODUCTION

1) The unconstitutional execution of an otherwise valid sentence, such as an unconstitutional denial of parole, may be addressed via the writ of habeas corpus under 28 U.S.C. § 2241 and/or 2254. *See, e.g., Coady v. Vaughn*, 251 F.3d 480 (3rd Cir. 2001) (Finding Section 2241 available for federal prisoners, with 2254 available for state prisoners); *see also Greene v. Tenn. Dept. of Corrections*, 265 F.3d 369 (6th Cir. 2001) (Challenge to ruling of prison disciplinary board reviewed under both sections). Here Petitioner Donavous Drennon seeks such remedy because the Board of Parole has denied him parole in violation of due process, and also because it has

1

placed him twice in jeopardy for the same offenses for which he was already acquitted.

## THE PARTIES

2) Petitioner Donavous Drennon, TOMIS # 374791, is imprisoned at the Turney Center Industrial Complex. He is held on convictions for Tampering with Evidence, and being a Felon in Possession of a Firearm with a Prior Drug Conviction, with a total sentence of 8 years at 35%. The sentences arise out of the Circuit Court for Rutherford County, Tennessee. As discussed below, though, the actual judgment being challenged herein is not the convictions, but rather the Board of Parole's decision to deny parole on May 25, 2023, and even to bar Drennon from any further parole reconsideration for another 4 years.

3) The Respondent, Christopher Brun, is the Warden of the Turney Center Industrial Complex, a state prison where the Petitioner is housed. Warden Brun is sued only in his official capacity.

## FACTUAL BACKGROUND

4) Petitioner Drennon was charged in Rutherford County with First Degree Murder, Aggravated Assault, Possession of a Firearm by a Felon, and Tampering with Evidence — all related to a shooting death. At trial, he acknowledged shooting the alleged victim. But he said that he acted in self-defense.

2

Consequently, the jury acquitted him of homicide. They also acquitted him of assault. However, they found him guilty of Possession of a Firearm by a Felon with a Drug Conviction. Also, they found him guilty of Tampering with Evidence — apparently just for not having left his firearm at the scene.

5) At sentencing, the judge gave him an effective sentence of 8 years in prison, with parole eligibility at 35%.

6) The convictions are still on direct appeal.

7) When Drennon's initial parole grant hearing came on May 23, 2023, he had not yet reached his 35% release eligibility mark. (He would not reach that point until approximately May 2024.) Nonetheless, the Board of Parole chose to consider him for parole early, apparently due to the State's 'safety valve' policy of lowering release eligibility dates. *Cf.* Tenn. Code Ann. § 41-1-504.

8) At the hearing, the hearing officer said that he viewed the crime as especially serious simply because Drennon had defended himself with the firearm. Even though Drennon told the hearing officer that he was acquitted of the homicide, the officer did not seem to care.

9) In the end, the hearing officer recommended the denial of parole, with the next parole hearing not to be scheduled until another 4 years had passed.

10) The stated reasons for denial were (a) Seriousness of the offense, and (b) Substantial likelihood of violating parole, two of the four parole disqualifiers from Tenn. Code Ann. § 40-35-503(b). The hearing officer conceded that, under

3

recent changes to Tennessee law, Drennon was entitled to *presumptive* parole. Such a presumption meant that Drennon had to be paroled unless the Board found "good cause" for denying him — good cause falling *outside* the four normal parole disqualifier categories. *See* Tenn. Code Ann. § 40-35-503(i). For his "good cause" here, the officer cited (c) "offense details," which meant that the crime was especially serious because Drennon had shot someone in self-defense, and (d) Drennon's "supervised release history," meaning that Drennon had violated probation on some other occasion (more than a decade earlier) and was therefore likely to violate parole.

11) The exact ruling was as follows:

Okay. Mr. Drennan, at this time, I do want to note for the record that you do qualify for presumptive parole release. You are under your release eligibility date as well as your safety valve date. Your safety valve date is July 16th of 2023 *[i.e., less than two months in the future]*. Your RED date is July 3rd, 2024, which does make this an early release hearing we're having today. You've been locked up for 16 months on this sentence, which does make you under average time served on this sentence. You are currently enrolled in the CBIP class.[1]

My recommendation to the Board at this time is to decline parole. I do find good cause to decline parole based on offense details and supervised release history. My recommendation is to decline parole due to high risk. You are considered to be a high risk candidate due to the fact that you have a history of probation violations while under supervision. You're also considered to be high risk due to the fact that you were carrying a firearm illegally at the time you committed this offense. Also, due to the seriousness of this offense, the information that I have is that you got into an argument with the victim over the treatment of his dog — of your dog — and, you then pulled out a gun and shot him, and the victim did die as a result of the injuries.[2] You were only

---

1 Drennon was only about five days away from completing this class.

4

Case 3:24-cv-01327   Document 1   Filed 11/06/24   Page 4 of 15 PageID #: 4

convicted on possession of firearm tampering with evidence charges. The other charges were dismissed.

To improve chance release on parole at your next hearing date, complete programming as recommended by the STRONG-R Assessment, and I'll give you a review date in May of 2027. Do you understand this recommendation, Mr. Drennon?

(May 2023 Hearing Audio, at 23:22—25:07).

12) The following day, the Board of Parole affirmed the ruling.

13) Drennon appealed administratively, asserting that the denial was illegal and unconstitutional because he met the criteria for presumptive parole, and that the cited grounds were legally insufficient to deny him in light of that presumption. He pointed out that, under the 2021 Reentry Success Act, the Board could only deny him for good cause, "[n]otwithstanding subsection (b)," Tenn. Code Ann. § 40-35-503(k), and that the cited subsection (b) is what authorizes denial for seriousness of the offense and for a substantial likelihood of violating the terms of supervision. And apart from those two grounds, here the Board had not cited any so-called good cause. Consequently, he contended that the Board had violated his right to due process. Further, insofar as the Board may have been implying that he actually murdered someone even though a jury acquitted him of such, Drennon said that the Board was violating the right against double jeopardy as well.

14) The Board denied the appeal on September 12, 2023.

---

2 The allegation that the fight arose over a dog was actually fabricated, and the jury rejected it.

15) Drennon then filed for certiorari with the Davidson County Chancery Court on November 13, 2023. As before, he tried to fault the Board for its illegal and unconstitutional denial of parole.

16) Ultimately, the Chancery Court dismissed the case for lack of subject-matter jurisdiction. The chancellor held that even though Drennon had filed timely, his attorney had failed to get the petition sworn. (Judgment, April 9, 2024). Consequently, the court had no subject-matter jurisdiction to address the merits. (*Id.*) And even though Drennon had already corrected the error (by amending and swearing to the petition), the court held that Rule 15's relation-back doctrine could not rectify a jurisdictional error. (*Id.*) Instead, the cure had to be filed within the 60-day statute of limitations. (*Id.*) Although this nitpicky and perverse procedure may seem absurd, it is worth noting that the chancellor was faithfully following Tennessee caselaw. *See, e.g., Blair v. Tenn. Bd. of Probation and Parole*, 246 S.W.3d 38 (Tenn. Ct. App. 2007). In other words, Drennon never had any reasonable expectation of reversing the chancellor's decision on appeal. Nor did he attempt to do so.

17) Due to the procedural dismissal, the claims herein are exhausted. That is, Drennon has no available state procedure in which to pursue the claims further.

18) Although Drennon failed to litigate the merits up through the Tennessee Court of Appeals, he is not barred from pursuing federal habeas corpus. That is because the state procedural bar was inadequate to cause a procedural

6

default. Sometimes a state procedural default can indeed bar an inmate from seeking federal habeas corpus. But this preclusion only applies if the state requirement is an independent and adequate bar, which requires that it must serve some legitimate state interest. *Henry v. Mississippi*, 379 U.S. 443, 447-48 (1965). In *Henry*, for example, a state had a valid interest in requiring a contemporaneous objection — a requirement that the accused failed to meet. *Id*. But since the state's interest was otherwise addressed via another procedure — an oral motion for directed verdict — the Supreme Court found the default inadequate to bar federal review. *Id*. The bar is similarly inadequate here. In Drennon's case, even assuming that the State has any valid interest in requiring that a certiorari petition be sworn (e.g., to discourage frivolous claims), still the State has no valid interest in refusing even to let the inmate *amend* his petition to add the oath. The Second Circuit expressly held as much in *Smart v. Scully*, finding no substantial or legitimate interest in refusing to let an inmate replead his accusations after he failed to swear to them initially, as required by law. 787 F.2d 816, 820 (2nd. Cir. 1986). The same rule should apply here.

19) Since Tennessee law otherwise routinely allows for the late signing of pleadings under Rule of Civil Procedure 11, and even routinely allows for the relation back of claims under Rule of Civil Procedure 15, no concerns about timeliness can possibly justify the strict procedural bar applied here. A writ of certiorari "orders the lower tribunal to file its record so that the [reviewing] court

7

can determine whether the prisoner is entitled to relief." *Willis v. Dept. of Correction*, 113 S.W.3d 706, 712 (Tenn. 2003). Assuming that one purpose of the required oath is to prevent the agency from having to produce its record without any good reason — *i.e.,* not until the petitioner shows probable cause to justify it — then the state purpose is still served even if the oath is delayed. So long as the oath is filed before the agency is made to produce the record, any interest of the State is fully satisfied. In other words, a statute of limitations probably makes sense. Requiring an oath perhaps makes sense. But combining the two simply does not make sense, or serve any legitimate interest. Because the state procedural bar is inadequate, Drennon has not procedurally defaulted. Instead, he may proceed in federal court.

20) No special deference is owed to any state court ruling. Since no state court ever addressed the claims on the merits, no deference is even possible.

## CLAIMS PRESENTED

### COUNT I

### VIOLATION OF DUE PROCESS

**Fourteenth Amendment**

21) The other sections are hereby incorporated by reference.

22) By denying parole on a legally insufficient basis, and indeed directly contrary to the relevant statutes, the Board of Parole violated the Fourteenth

8

Amendment's right to due process. *See Jackson v. Virginia*, 443 U.S. 307 (1979). In addition, by failing to explain any (statutorily valid) reason for the denial as required by *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, the Board violated due process. *See* 442 U.S. 1, 15-16 (1979). In the parole context, due process is satisfied if there is "some basis" for the denial. *Coady*, 251 F.3d 480, at 487. That reason must then be articulated to the inmate. Here, though, the Board had zero basis. And it gave no meaningful reason at all, except for reasons that are statutorily invalid.

23) Importantly, inmates eligible for presumptive parole under Tennessee's 2001 Reentry Success Act (RSA) have a liberty interest in parole. That liberty interest may only be taken away by due process. The RSA imposes a "presumption that an eligible inmate must be released on parole, except for good cause shown, upon reaching the inmate's release eligibility date or any subsequent parole hearing." Tenn. Code Ann. §40-35-503(i)(1). By default, The Constitution does not bestow a right to due process in parole grant hearings, but where state law provides an expectation of release, the state must provide due process before taking away the inmate's liberty interest. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1 (1979) (Finding liberty interest where inmates could only be denied upon a finding of one of four grounds — the very same four grounds listed in Tennessee law). In *Board of Pardons v. Allen*, the court expanded the doctrine somewhat further, finding a presumption of parole (and hence a liberty

9

interest) merely because a statute held that the parole board "shall" release a worthy parole applicant — even though worthiness for parole was defined quite vaguely. 482 U.S. 369 (1987). Tennessee's parole statutes are extremely similar to those in *Allen,* and therefore a strong argument can be made that *every* parole applicant in Tennessee has a right to due process. *See id.* at 377-78; *see also* Tenn. Code Ann. § 40-28-101 and 40-28-117(a).[3] (And as mentioned above, the laws here also appear to require release unless the Board finds one of the four criteria from *Greenholtz, supra.*) But even if not every applicant has a liberty interest, the RSA expressly uses the language of "presumption" with regard to RSA-eligible inmates like Drennon. The presumption of parole is what creates the liberty interest. *Allen,* 482 U.S. 369, at 374-75. As such, even assuming that some inmates lack a liberty interest, Drennon undeniably has one. His liberty interest may only be taken away pursuant to due process.

24) To be clear, the RSA only guarantees a presumption of parole at an inmate's release eligibility date. Here the Board considered Drennon for parole approximately 1 year prior to his default 35% release eligibility date, apparently lowering his release eligibility date under the State's safety valve policy. *See* Tenn. Code Ann. § 41-1-504; (Hearing Audio, at 23:22—25:07). By choosing to consider him release eligible at this earlier point, the RSA presumption applied to him at

---

3 The Sixth Circuit found otherwise in *Wright v. Trammell,* 810 F.2d 589 (6th Cir. 1987). But that case was issued before *Allen,* and it did not address the statutes cited here.

this earlier point.[4] In other words, the RSA does not appear to require that an inmate reach his 35% mark before qualifying. Instead, as the hearing officer conceded, Drennon was an RSA inmate merely because he was fast approaching his safety valve date.

25) Alternatively, even if Drennon did not gain any release eligibility until 1 year later on May 2024, still the Board violated the law by delaying any further consideration for 4 years, rather than bringing him back up for another hearing in 1 year.

26) Under the RSA, Donavous Drennon is entitled to parole at his release eligibility date "notwithstanding subsection (b)." Tenn. Code Ann. § 40-35-503(i). The cited subsection (b) is the law that lays out the four ordinary parole disqualifiers — Seriousness of the offense, substantial likelihood of violating the terms of supervision, etc. Under Drennon's presumptive right to parole, the only exception whereby parole could still be denied was if the Board could point to some *other* "good cause," external to subsection (b). But for its good cause here, the Board only alluded to the seriousness of the offense and to the substantial likelihood of violating — the very same items found in subsection (b).

27) In other words, the "good cause" based on "offense details" apparently just meant that the offense was serious. Namely, it was serious because, while committing it, Drennon shot someone in self-defense. (If the "offense details" meant

---

4  According to the hearing officer, he was about 1-2 months away from his safety valve release date.

anything else, certainly the hearing officer never explained what.) As a matter of law, the seriousness of the crime could not be a ground for denying parole to Drennon because the RSA says "notwithstanding subsection (b)," and seriousness of the crime is found in subsection (b). Therefore, it violated due process to deny parole based on "offense details," a term which is just code for seriousness of the offense.

28) As for the "history of supervision," this purported good cause just referred to Drennon's substantial likelihood of violating parole. Apparently, the hearing officer (and the Board) felt that Drennon was likely to violate because he had violated at some point many, many years prior. Notably, despite whatever violation(s) occurred back then, his probation was never even fully revoked, and in the end he completed probation successfully. Therefore, the Board's logic — finding him likely to violate — is dubious at best and fraudulent at worst. Regardless, it simply does not matter how likely Drennon may be to violate. Once again, the presumptive parole statute *requires* the Board to release him even if he is likely to violate. Any good cause must fall outside the scope of subsection (b), whereas substantial likelihood to violate is part of subsection (b). In the end, it violated due process to deny parole for supervision history — code for substantial likelihood to violate — where the statute expressly prohibited denial on that basis.

29) Ultimately, one major purpose of the RSA was to stop the Board from arbitrarily denying parole to eligible offenders based on its usual vague criteria — seriousness of the offense, substantial likelihood of violating, and other such

grounds found in Tenn. Code Ann. § 40-35-503(b). In Drennon's case, though, by simply re-wording these same grounds — referring to "seriousness of the offense" as "offense details," and referring to "substantial likelihood of violating the terms of supervision" as "history of supervision" — the Board is blatantly and intentionally violating state law. It is also denying parole without any valid basis, and thereby violating due process. *See Coady*, 251 F.3d 480, at 487.

30) Finally, insofar as the terms "offense details" and "history of supervision" are not explained whatsoever as any different from the invalid criteria from subsection (b), the Board has violated one of the express rights described in *Greenholtz*, 441 U.S. 1. In that case, the Supreme Court held that, among other rights, a parole applicant is entitled to a statement of reasons for denial (albeit not any in-depth legal opinion). *Id.* at 15-16, *citing Dorszynski v. United States*, 418 U.S. 424 (1974). Such required procedure "informs the inmate in what respect he falls short[.]" *Id.* The court analogized it to a sentencing judge's requirement of making basic factual findings before sending a juvenile to prison. *Id.* Yet if the Board may simply recite the words "offense details," such phrase does not convey any explained reason whatsoever, other than simply an allusion to the seriousness of the offense. And if the Board may simply recite the words "history of supervision," such phrase does not convey any explained reason whatsoever, other than simply an allusion to the likelihood of violating. By failing to explain whatsoever how it is adhering to the

RSA, or how the inmate has fallen short even under RSA's generous presumption of parole, the Board violated due process.

## COUNT II

## DOUBLE JEOPARDY

### Fifth and Sixth Amendments

31) The other sections are incorporated by reference.

32) By denying Drennon parole based on acquitted conduct, and executing a sentence to punish him more than the law allows for his actual conduct of conviction, the Board has placed him in double jeopardy in violation of the Fifth Amendment (and the related right to a jury under the Sixth).

33) The Supreme Court has allowed for the enhancement of sentences based on acquitted conduct — but only so long as the resulting sentence falls within the statutory range for the convictions by themselves. *Witt v. United States*, 515 U.S. 389, 403-04 (1995). Where the sentence exceeds the legally permissible sentence for the crime of conviction, the jury's verdict is wrongly disregarded and the Constitution violated. *United States v. Booker*, 543 U.S. 220 (2005).

34) Here, under the nonviolent convictions by themselves, Drennon was statutorily entitled to parole at his earliest release date (absent good cause, as already discussed). *See* Tenn. Code Ann. § 40-35-503(i). But here the Board punished him by refusing him release, despite the statutory presumption, simply

because he supposedly assaulted and murdered someone. The problem, though, is that the jury already acquitted him of any assault and murder. By condemning Drennon to additional time in prison for acquitted conduct — punishment unavailable for the crimes of Tampering with Evidence and Felon in Possession — the Board has violated the right against double jeopardy.

## CONCLUSION

PREMISES CONSIDERED, Donavous Drennon prays for the writ of habeas corpus. Specifically, said writ should mandate his immediate release on parole. But if that specific remedy is somehow unavailable, then he asks that the writ at least order a new, immediate parole hearing.

Respectfully submitted,

/s/ Drew Justice
Drew Justice #29247
Attorney for Donavous Drennon
1902 Cypress Drive
Murfreesboro, TN 37130
(615) 419-4994
drew@justicelawoffice.com

## VERIFICATION

I, Petitioner Donavous Drennon, declare under penalty of perjury according to the laws of the United States of America that the facts alleged in this petition are true and correct.

_____
DONAVOUS DRENNON #374791

11/6/24
Date Executed